**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | | |
|---|---|---|
| WILLIAM WILSON, | * | |
| | * | |
| Plaintiff, | * | |
| | | |
| | * | |
| v. | * | Case No. 12-cv-2092-AW |
| | * | |
| BOARD OF EDUCATION OF | * | |
| PRINCE GEORGE'S COUNTY, | * | |
| | * | |
| Defendant. | * | |
| | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## MEMORANDUM OPINION

Plaintiff William Wilson filed suit against Defendant Board of Education of Prince George's County (the Board) on July 13, 2012, claiming the Board failed to accommodate his disability, failed to engage in an interactive process, and constructively discharged him. Doc. No. 1. Pending before the Court is the Board's Motion for Summary Judgment on all claims. Doc. No. 15. The Court has reviewed the motion papers and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2011). For the reasons articulated below, Defendant's motion will be **GRANTED-IN-PART** and **DENIED-IN-PART.**

### I. FACTUAL AND PROCEDURAL BACKGROUND

Wilson started working as a special education teacher in the ED Transition program at Dr. Henry Wise Jr. High School (Wise) on August 15, 2011. Doc. No. 15-2, Wilson Dep., at 40:2-19, 51:15-52:3. The ED program was designed to serve higher functioning special education students with the disability of emotional disturbance. Doc. No. 15-3, Brodus-Yougha Aff. ¶ 4. In October 2011, Wise's principal, Carletta Marrow, asked Wilson to fill an open slot in

the CRI program. Doc. No. 15-2, at 66:3-67:4. The CRI program is designed for cognitively low-functioning special education students who need assistance for most activities. Doc. No. 15-3 ¶ 16. Students in the CRI program are provided with internships and are taken on field trips in order to prepare them for life after high school. *Id*. ¶ 17. Wilson agreed to fill the slot, and sent e-mails to Marrow in October 2011 in which he indicated that he was "very happy" to transfer to the CRI program, and in which he thanked Marrow for giving him the opportunity to participate in the program. Doc. Nos. 15-8, 15-10.

Wilson has a permanent neuropathy in his left foot, causing him severe pain if he stands or walks for extended periods of time. Doc. No. 16-1, Wilson Aff. ¶¶ 10-11. Wilson had surgery in an attempt to correct the pain, but the surgery was unsuccessful. *Id*. ¶ 14. Because of his neuropathy, Wilson has a Virginia permanently disabled parking placard. *Id*. ¶ 22. The parties dispute the extent of Wilson's injury. Wilson maintains that his neuropathy is debilitating, putting him in "chronic and constant" pain, forcing him to use an electric wheelchair, and rendering him unable to perform a number of physical activities. *Id*. ¶¶ 11-21. Notes from Wilson's doctors explain that he suffers from "residual left leg chronic pain/neuropathy/impairment and disability," and that he must be limited to sedentary work allowing for "frequent episodes of sitting [and] minimal standing." Doc. Nos. 16-3, 16-6. The Board's doctor, Ian M. Weiner, M.D., examined Wilson on January 21, 2013 and concluded that his injury was much less severe, finding that he "did not see any limitations on Mr. Wilson's ability to stand or walk based on his evaluation today." Doc. No. 15-12 at 2. The Board submits additional medical evidence from a physical therapist suggesting that Wilson suffers only a 13% foot impairment, 9% lower extremity impairment, and 4% total body impairment. Doc. No. 15-13.

Wilson maintains that the added walking and standing required by the CRI program, along with additional walking and standing from being forced to do hall and bus duty, caused him significant pain in his foot. Doc. No. 16-1 ¶¶ 9, 23, 28, 45-46. The parties dispute the extent to which Wilson informed his superiors of this problem. Wilson claims that he told his immediate superior, Dr. Dawn Brodus-Yougha, about his condition in November 2011. Doc. No. 16-1 ¶ 23. According to Wilson, he then presented Brodus-Yougha with a doctor's note detailing his disability. *Id*. ¶¶ 25-27. Brodus-Yougha instructed him to give the note to Marrow. *Id*. Wilson avers that he did so, though he does not specify the date on which he presented the note to Marrow. *Id*. Marrow maintains that she was not informed of Wilson's disability until December 28, 2011, when Wilson sent her an e-mail asking to be transferred back to the ED Transition program. Doc. No. 15-9, Marrow Aff. ¶ 18; Doc. No. 15-5. Brodus-Yougha maintains that Wilson never discussed his disability with her in November 2011, and that the first time she learned of Wilson's disability was after Wilson sent the December 28 e-mail. Doc. No. 15-3 ¶¶ 11-13, 26-28. Wilson's December 28 e-mail read:

> Good morning Ms. Marrow. I hope you are having a great holiday break. I am up in New York with my mom. I have been doing a lot of soul searching since I have been up here. I realized I enjoyed working with the transition students so much more than I do the CRI students. I have a passion for taking a higher educational level subject and helping students understand the information so they can pass their HSA exams. I feel very out of place in the CRI world academically and with the level of education for the students involved. It is also very difficult for me to walk around during the internship field trips, CBI field trips and for the amount of standing I would have to do at the CRI Internship sites with my physical disability. I have a doctor's permanent standing order for limited walking and standing due to the permanent neuropathy in my left foot. I was wondering if it would be possible to move back to the transition program to take Ms. McDew's classes? Thank you for your time and consideration in this matter.

Doc. No. 15-5. Marrow responded to the e-mail by telling Wilson that before she moved him back to the ED Transition program, she would like to identify a teacher who could take his place in the CRI program. *Id*. She further instructed Wilson to contact Elizabeth Davis in the Board's ADA office in reference to his disability, to "ensure that [he had] the proper accommodations and modifications in place." *Id*.

Wilson attempted to e-mail Davis, believing her e-mail address to be elizabeth.davis@pgcps.org, when in actuality her e-mail address was edavis@pgcps.org. Doc. No. 15-2, at 253:20-254:4; Doc. No. 15-6, Davis Aff. ¶ 4. Wilson also put the relevant medical documents in an envelope, and placed the envelope in the School Board's internal mail system with an attached note reading "central office Elizabeth Davis." Doc. No. 15-2, at 126:17-127:5. Wilson never received a response from the ADA office, and he never followed up on his request with Davis. *Id*. at 254:14-15; Doc. No. 15-4, Request for Admission No. 5. Davis maintains that she never received an e-mail or an interoffice communication from Wilson. Doc. No. 15-6, ¶¶ 6-7. Furthermore, the Board has an administrative policy, Administrative Procedure 4172, that it uses to handle requests for accommodations made by employees. Doc. No. 15-7. Wilson admits that he did not follow the proper procedure in requesting accommodations from the Board. Doc. No. 15-4, Request for Admission No. 8.

In Early January 2008, Marrow denied Wilson's requests to transfer back to the ED Transition program, or alternatively, to transfer to a different school. Doc. No. 16-1 ¶¶ 37-42. Wilson claims that Marrow told him that her refusal was based on his status as a first year, untenured teacher. *Id*. ¶ 39. Marrow maintains that she refused Wilson's requests to transfer because it would have left her without a teacher for the CRI program. Doc. No. 15-9, ¶ 32. Moreover, Marrow believes that the reason Wilson requested a transfer was not because of his

disability, but rather due to his rocky relationship with Brodus-Yougha. *Id*. ¶ 27. According to

Marrow, while Wilson requested transfer a number of times between December 2011 and

February 2012, he only mentioned his injury twice before resigning, first in the December 28,

2011 e-mail, and then again in an e-mail on February 10, 2012. *Id*. Every other time, Wilson's

reason for requesting a transfer was "to get Dr. Brodus-Yougha off his back." *Id*.

Wilson resigned on February 24, 2012. The broad thrust of Wilson's resignation letter

was that his resignation was due to the "hostile work environment" created by Dr. Brodus-

Yougha. Doc. No. 15-14. The primary focus of the letter was on the bullying and mental distress

that Wilson claimed to suffer as a result of working with Brodus-Yougha. *Id.* Moreover, the

letter, at length, discussed Wilson's mother's illness as a reason for his resignation. *Id.* The letter

made one mention of Wilson's disability, stating that Marrow's refusal to transfer Wilson back

to the ED program as a result of his disability was a factor in his decision to resign. *Id*.

Wilson maintains that, prior to his resignation, he appealed Marrow's decision to refuse a

transfer to three different individuals: Associate Superintendent Monica Goldson, Director of

Human Resources Synthia Shilling, and Superintendent William Hite. Doc. No. 16-1 ¶¶ 43-52.

All three appeals were denied. *Id*. After his resignation, Wilson filed suit, alleging that the school

failed to accommodate his disability, failed to engage in an interactive process, and

constructively discharged him. Doc. No. 1.

## II. STANDARD OF REVIEW

Summary judgment is only appropriate "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). The Court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). In ruling on a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." *Okoli v. City of Baltimore*, 648 F.3d 216, 231 (4th Cir. 2011) (quoting *Anderson*, 477 U.S. at 255).

To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or other similar evidence to show that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A disputed fact presents a genuine issue "if, after reviewing the record as a whole . . . a reasonable jury could return a verdict for [the non-moving party]." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996) (citing *Anderson*, 477 U.S. at 248). Although the Court should believe the evidence of the nonmoving party and draw all justifiable inferences in his favor, a nonmoving party cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

### III. ANALYSIS

#### 1. Failure to Accommodate

Wilson asserts that the Board failed to accommodate his disability in violation of Section 504 of the 1973 Rehabilitation Act.[1] Doc. No. 1 ¶¶ 43-52. "To establish a prima facie case for failure to accommodate, Plaintiff must show: '(1) that he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position ...; and (4) that the employer refused to make such accommodations.'" *Rock v. McHugh*, 819 F. Supp. 2d 456, 473 (D. Md. 2011) (quoting *Rhoads v. FDIC*, 257 F.3d 373, 387 n.11 (4th Cir. 2001)). The Board claims that it is entitled to summary judgment for two reasons: First, it claims that Wilson failed to engage in an interactive process to find a reasonable accommodation. Second, it argues that Wilson does not have a disability.

A genuine issue of material fact exists over whether Wilson engaged, in good faith, in an interactive process with the Board to find a reasonable accommodation. "Implicit in [the requirement that the employer refused to make a reasonable accommodation], is the requirement that the employee has, in good faith, engaged in an interactive process to identify, in cooperation with the employer, what would constitute a reasonable accommodation." *May v. Roadway Express, Inc.*, 221 F. Supp. 2d 623, 627 (D. Md. 2002). The Fifth Circuit elaborated:

> [R]ecognizing that the responsibility for fashioning a reasonable accommodation is *shared* between the employee and the employer, . . . courts have held that an

---

[1] "The standards used to determine whether an employer has discriminated under the Rehabilitation Act are the standards applied under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12111 et seq., and the provisions of sections 501 through 504, and 510 of the ADA, 42 U.S.C. §§ 12201–12204 and 12210. *See* 29 U.S.C. § 791(g)." *Hooven-Lewis v. Caldera*, 249 F.3d 259, 268 (4th Cir. 2001). Precedent interpreting provisions of the ADA therefore functions as precedent in Rehabilitation Act cases.

employer cannot be found to have violated the ADA when responsibility for the breakdown of the informal, interactive process is traceable to the employee and not the employer.

*Loulseged v. Azko Nobel Inc.*, 178 F.3d 731, 736 (5th Cir. 1999) (citations omitted) (internal quotations omitted); *see also May*, 221 F. Supp. 2d at 627. This District has embraced the view that an employee must participate in an interactive process. "A party that obstructs or delays the interactive process, or simply fails to communicate, is not acting in good faith to find a solution. . . . Nevertheless, an employer cannot escape liability simply because the employee does not suggest a particular reasonable accommodation that would assist him." *Fleetwood v. Harford Systems, Inc.*, 380 F. Supp. 2d 688, 701 (D. Md. 2005) (citations omitted).

In *Fleetwood*, Judge Blake held that a genuine issue of material fact existed over whether an employee was engaging in the interactive process even where the employee did not provide evidence of his disability to his employer, and where the employee did not reveal to the employer that an existing accommodation was ineffective. *Id*. at 702. The employee had dyslexia, and told his employer as much, but failed to provide the employer with any medical documentation. *Id*. at 692, 694-95, 702. One of the key functions of the employee's job was to fill out timecards, and his dyslexia made it exceedingly difficult for him to do so. *Id*. at 692. The employer provided the employee with tutoring, but the employee failed to inform the employer that the tutoring was not helping him fill out his timecards. *Id*. at 694-95. At the same time, the employer did little to find out about the extent of the employee's dyslexia, and the specific workplace-related limitations that resulted from it. *Id*. Moreover, the employer never made an effort to determine if the tutoring the employee received was assisting him in completing

timecards. *Id*. at 702. Noting the deficiencies on the part of both parties in their efforts to engage in the interactive process, the court found that there was a genuine dispute of material fact. *Id*.

Here, taking Wilson's account as true, Wilson arguably did more than the employee in *Fleetwood* did to engage in an interactive process with his employer. Wilson told two immediate supervisors about his condition and provided them with supporting medical documentation. Doc. No. 16-1 ¶¶ 23, 25-27. He appears to have requested at least three specific accommodations to those superiors: a transfer to a different school, a transfer back to the ED Transition program, and permission to sit down during hall duty. *Id*. ¶¶ 28-29, 37-42. Wilson then lodged three separate appeals of Marrow's refusal to transfer him, appealing to Assistant Superintendent Monica Goldson, Director of Human Resources Synthia Shilling, and Superintendent William Hite. *Id*. ¶¶ 47-52. By contrast, in *Fleetwood*, the employee never provided medical documentation to his employer, suggested no further accommodations once an initial accommodation was unsuccessful, and failed to inform his employer that the existing accommodation was failing. *Fleetwood*, 380 F. Supp. 2d at 702. Wilson's actions are sufficient to survive a motion for summary judgment. Indeed, in the bulk of cases in this District where summary judgment was granted based on the employee's failure to participate in an interactive process, there was no evidence whatsoever that the employee even attempted to engage the employer. *White v. Hedwin Corp.*, No. WMN-08-CV-1910, 2009 WL 3246953, at \*6 (D. Md. Oct. 5, 2009) ("To the extent that Defendant was on notice that Plaintiff had a 10% service connected disability rating, Plaintiff stated in his deposition that it was not his responsibility to tell Defendant that he had a disability or to request accommodation."); *Davis v. Thompson,* 367 F. Supp. 2d 792, 803-04 (D. Md. 2005) ("Not only did [the employee] decline [his superior's] offers to accommodate his fatigue if he returned to work, he failed to engage in any discussion about when he might return

9

to work in any capacity."); *May*, 221 F. Supp. 2d at 628 ("Plaintiff's undisputed and complete

failure to respond to [the employer's] request [for medical documentation] is fatal to his failure

to accommodate claim."). It can hardly be said that Wilson did nothing to engage in the

interactive process. While Wilson's failure to follow the proper administrative procedure and

failure to follow up with Elizabeth Davis may constitute a "deficiency in communication," the

Court cannot say, as a matter of law, that Wilson failed to engage in an interactive process with

his employer. *See Fleetwood,* 380 F. Supp. 2d at 702

Second, Defendant asserts that Wilson is not disabled as a matter of law. In 2008,

Congress passed the ADA Amendments Act (ADAAA), liberalizing the standard used to

establish disability under the ADA.[2] This Court recently explained, "in enacting the ADAAA,

Congress sought to reject the standards enunciated by the Supreme Court ... that ... the definition

of disability under the ADA 'need[s] to be interpreted strictly to create a demanding standard for

qualifying as disabled.'" *Bennett v. Kaiser Permanente*, No. 10–CV–2505 AW, 2013 WL

1149920, at *6 (D. Md. Mar. 20, 2013) (quoting 42 U.S.C.A. § 12101). Indeed, "the ADA, as

amended by the ADAAA, requires that the 'definition of disability in [the ADA] shall be

construed in favor of broad coverage.'" *Barrett v. Bio-Medical Applications of Md., Inc.*, No.

ELH–11–2835, 2013 WL 1183363, at *9 (D. Md. Mar. 19, 2013) (quoting 42 U.S.C.A. §

12102(4)(A)). Under the ADAAA, a disability includes "a physical or mental impairment that

substantially limits one or more major life activities of such individual." 42 U.S.C.A. §

12102(1)(A). Walking and standing are both considered major life activities. *Id.* § 12102(2)(A).

---

[2] "Courts use the same standards to analyze a claim for discrimination under the Rehabilitation Act as they do a claim for discrimination under the ADAAA." *LaPier v. Prince George's Cnty., Md.,* No. 10–CV–2851 AW, 2013 WL 497971, at *5 (D. Md. Feb. 7, 2013) (citations omitted).

"One can divide this definition of disability into three prongs: (1) whether someone suffers from a physical impairment; (2) whether the physical impairment limits at least one of the person's major life activities; and (3) whether such limitation is substantial." *LaPier v. Prince George's Cnty., Md.,* No. 10–CV–2851 AW, 2012 WL 1552780, at \*7 (D. Md. Apr. 27, 2012). The EEOC has established regulations parsing the definition of a substantial limitation:

> [T]he EEOC has issued regulations that, while declining to expressly define the term "substantially limits," embody a set of detailed guidelines for determining whether an impairment substantially limits a major life activity. *See* 29 C.F.R. § 1630.2(j). For instance, the EEOC's regulations provide that "[a]n impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." *Id.* § 1630.2(j)(1)(ii). The EEOC's regulations further provide that "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting."

*Id*.

To support its contention that Wilson is not disabled, Defendant largely relies on caselaw that predates the enactment of the ADAAA. Doc. No. 15-1, at 10-13. However, "the continued validity of such cases is suspect." *Barrett*, 2013 WL 1183363, at \*9. Wilson provides substantial evidence, via his affidavit and two doctor's notes, that he cannot walk or stand in the same way as "most people in the general population." *LaPier*, 2012 WL 1552780, at \*7 (quoting 29 C.F.R. § 1630.2(j)(1)(ii)). Doc. Nos. 16-1, 16-3, and 16-6. The doctor's notes indicate that Wilson suffered from left foot neuropathy, and that he was limited to "sedentary work." Doc. Nos. 16-3, 16-6. Moreover, one of the letters indicates that Wilson will need "frequent episodes of sitting and minimal standing." Doc. No. 16-3.

Indeed, the evidence put forth in the present case compares favorably to the facts in *LaPier*, where this Court ruled that the employee's alleged blood disorder qualified as a

11

disability under the ADAAA. 2012 WL 1552780, at *7-8. In *LaPier*, "[p]laintiff resumed his normal training activities after a weeklong period during which his doctors advised him to perform only light work. In a letter dated May 5, 2009, one of Plaintiff's doctors informed the County that Plaintiff was fit to resume normal training activities." *Id.* at *1. The plaintiff in *LaPier* had a disorder that only temporarily affected his ability to work; on the other hand, Wilson's limitation is arguably more severe because it permanently affects his ability to walk and stand and permanently limits him to sedentary work. Doc. Nos. 16-3, 16-6.

The Board argues that it is entitled to judgment as a matter of law because Wilson has not named a medical expert in this case. Nonetheless, Wilson's affidavit explains his own perceptions in relation to his injury. This, in conjunction with the two doctor's notes Wilson provides, creates a genuine issue of material fact regarding Wilson's alleged disability. An attempt to determine whether Wilson suffered from a disability would necessitate an impermissible determination of credibility by the Court. *See Okoli*, 648 F.3d at 231.

Finally, the Board asserts that Wilson has submitted a sham affidavit in an attempt to create a genuine issue of material fact surrounding his disability. It points to alleged contradictions between Wilson's deposition testimony and admissions and his affidavit. In his affidavit, Wilson states that he must use an electric wheelchair, but his deposition testimony makes it clear that while he was teaching, he was able to walk around without use of a wheelchair. Doc. No. 16-1 ¶ 21; Doc. No. 18-2, Wilson Dep., at 70:5-71:16. The contradiction becomes apparent when viewed in the context of Wilson's admissions, where Wilson admits that his condition has not worsened since his employment with the Board ended. Doc. No. 18-1.

However, even if the Court were to strike this portion of the affidavit as a sham, the Court's analysis would not be affected. That Wilson uses an electric wheelchair is not dispositive.[3]

While recognizing that the failure to accommodate claim is a close call, the Court will construe all inferences in Plaintiff's favor, and accordingly, will conclude at this juncture that there are material facts in genuine dispute.

### 2. Failure to Engage in an Interactive Process

Plaintiff's Count II asserts "Failure to Engage in an Interactive Process" as an independent cause of action. No such cause of action exists:

> [A]n employee cannot base a reasonable accommodation claim solely on the allegation that the employer failed to engage in an interactive process. *See Rehling v. City of Chicago,* 207 F.3d 1009, 1016 (7th Cir.2000). Rather, the employee must demonstrate that the employer's failure to engage in the interactive process resulted in the failure to identify an appropriate accommodation for the disabled employee.

*Walter v. United Airlines, Inc.*, 232 F.3d 892, at *4 (4th Cir. 2000) (unpublished table decision). Hence, failure to engage in an interactive process is merely an element that can be used to establish failure to accommodate. It does not exist as an independent cause of action. Count II will therefore be dismissed as a matter of law.

---

[3] The Board also asserts that Wilson's deposition testimony, in which he discusses walking and standing for long periods of time, contradicts Wilson's affidavit insofar as the affidavit states that Wilson can only stand for five minutes. On this point, there does not appear to be a contradiction. Wilson's affidavit states that Wilson had a doctor's order to only stand for five minutes, not that he was physically incapable of standing for longer periods. Doc. No. 16-1, ¶ 44.

### 3. Constructive Discharge

"To prove constructive discharge, [Plaintiff] must show that [Defendant] deliberately made his working conditions intolerable in an effort to induce him to quit. . . . He must prove two elements: (1) the deliberateness of [Defendant's] actions and (2) the intolerability of the working conditions." *Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1132 (4th Cir. 1995) (citations omitted) (internal quotations omitted).[4] "Intolerability is assessed by the objective standard of whether a reasonable person in the employee's position would have felt compelled to resign." *E.E.O.C. v. Clay Printing Co.*, 955 F.2d 936, 944 (4th Cir. 1992) (internal quotations omitted). To establish deliberateness, the Plaintiff must demonstrate that Defendant's actions "were intended by the employer as an effort to force the employee to quit." *Whitten v. Fred's, Inc.*, 601 F.3d 231, 248-49 (4th Cir. 2010). "Intent may be shown by evidence that an employee's resignation was the reasonably foreseeable consequence of the employer's conduct. . . . For example, intent may be inferred from a failure to act in the face of known intolerable conditions." *Amirmokri*, 60 F.3d at 1132-33 (citations omitted); *see also Whitten*, 601 F.3d at 249.

The Fourth Circuit warns against treating every failure to accommodate as a constructive discharge, for there could exist a circumstance where an employer's actions fail to meet the accommodation standards of the Rehabilitation Act, but nonetheless do not constitute a deliberate act forcing an employee to resign. *Johnson v. Shalala,* 991 F.2d 126, 132 (4th Cir.

---

[4] "The Rehabilitation Act expressly incorporates the standards of the Americans with Disabilities Act (ADA). [29 U.S.C.] § 794(d). The ADA, in turn, follows the 'powers, remedies and procedures' set forth in Title VII of the Civil Rights Act of 1964, as amended. *See* 42 U.S.C. § 12117(a) (2000)." *Spencer v. Ashcroft*, 147 F. App'x 373, 375 (4th Cir. 2005). Hence, Title VII precedent concerning constructive discharge also functions as precedent for constructive discharge cases brought under the Rehabilitation Act.

1993). Regardless, "a complete failure to accommodate, in the face of repeated requests, might

suffice as evidence to show the deliberateness necessary for constructive discharge." *Id.*

Plaintiff has failed to raise a genuine issue of material fact that the Board's actions were

deliberate. This case is distinct from *Crabill v. Charlotte Mecklenburg Board of Education*, 423

F. App'x 314, 324 (4th Cir. 2011) (unpublished), where a school guidance counselor presented

evidence that she was repeatedly stonewalled upon her requests for accommodation, and where

she was arguably denied a transfer. In *Crabill*, the undisputed evidenced revealed significant

animosity between the administration and the guidance counselor that suggested the school's

failure to accommodate may have been a deliberate attempt to discharge her. *Id.* at 317-18. Here,

however, the undisputed evidence reflects that the administration actively wanted Wilson to stay

because he was the only teacher qualified to teach in the CRI program. Doc. No. 15-5; Doc. No.

15-3 ¶ 32; Doc. No. 15-9 ¶ 29-32.

Indeed, the facts in *Johnson* are instructive. There, the employer's behavior demonstrated

that there was no intent to discharge the employee; they approved minor accommodations for the

employee, and assisted her when her psychiatrist recommended she opt for disability retirement.

*Johnson*, 991 F.2d at 132. Here, Wilson remained in the CRI program because his superiors were

unable to identify another teacher qualified to take over the program. Doc. No. 15-5; Doc. No.

15-3 ¶ 32; Doc. No. 15-9 ¶¶ 29-32. Essentially, Wilson's requests were denied because the Board

*needed him to stay*. This is further supported by the undisputed fact that Marrow directed Wilson

to the Board's ADA office to ensure he had appropriate accommodations. Doc. No. 15-5.

Wilson has put forth no alternative motivation for the denial of his requests.  Accordingly,

Defendant is entitled to summary judgment on Wilson's constructive discharge claim.

**IV. CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment will be

**GRANTED-IN-PART** and **DENIED-IN-PART.**  A separate Order follows.


_____June 18, 2013_____                             _____/s/_____
          Date                                              Alexander Williams, Jr.
                                                            United States District Judge